UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. MEINEN and<br>JESSIE MEINEN, | ) | CIV. 10-5077-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| GODFREY BRAKE SERVICE &<br>SUPPLY, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

Plaintiffs Michael Meinen and Jessie Meinen, husband and wife, filed this lawsuit, invoking this court's federal question jurisdiction under 28 U.S.C. §§ 451, 1331, 1337, 1343(a)(4), 1345 and 42 U.S.C. § 12117.  Plaintiffs bring this action against Godfrey Brake Service & Supply, Inc. ("Godfrey Brake" or "Godfrey"), alleging discrimination and wrongful termination in violation of the Americans with Disabilities Act ("ADA"), intentional infliction of emotional distress, and conversion.  See Docket No. 1.

Pending before the court is a motion for partial summary judgment filed by plaintiffs.  See Docket No. 28.  Also pending before the court is a motion for summary judgment filed by the defendant.  See Docket No. 36.  The district court, the Honorable Jeffrey L. Viken, referred these motions to this magistrate

judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  See

Docket No. 56.

## MATERIAL FACTS

Godfrey Brake Service & Supply, Inc. is a South Dakota corporation

located in Rapid City, South Dakota.  See Docket No. 37 at ¶ 3.  Dan Godfrey

and Bob Godfrey, brothers, each own 50% of Godfrey Brake.  See Docket No.

30-1 (B. Godfrey Depo. at 6).  Godfrey is engaged in the business of selling

parts and servicing trucks and equipment.  See Docket No. 37 at ¶ 3.

Godfrey's maintains a written policy prohibiting discrimination.  See

Docket No. 30-1.  However, neither Bob Godfrey nor Dan Godfrey were aware of

the written policy nor do they conduct formal training for employees on

disability discrimination.  See Docket Nos. 30-1 (B. Godfrey Depo. at 9, 11-12);

30-2 (D. Godfrey Depo. at 8).  However, Godfrey has continuously posted the

required flyers and placards on the premises and Dan Godfrey testified that

discrimination is not allowed at Godfrey Brake.  See Docket Nos. 40 at ¶ 13;

30-2 (D. Godfrey Depo. at 8).  Additionally, employees are provided with and

asked to review a copy of the employee handbook when they are hired, which

includes Godfrey's written policy prohibiting discrimination.  See Docket No.

30-2 (D. Godfrey Depo. at 11-12).

Beginning in 2001, Michael Meinen became employed with Godfrey

Brake and held a full-time position in the parts department.  See Docket No.

2

30-4 (Meinen Depo. at 7).  Although an occasion employee assigned to other departments within Godfrey would assist at the parts counter, prior to December of 2007, Godfrey did not employ any part-time employees within parts department.  See Docket Nos. 49 at ¶ 4, 50 at ¶ 6, and 40 at ¶ 3.

On or about December 29, 2007, Mr. Meinen became ill.  See Docket No. 30-4 (Meinen Depo. at 11-12).  Mr. Meinen indicated that when he got to work on December 29, 2007, he got dizzy but that he just tried to ignore it.  Id.  After finishing his shift at Godfrey, Mr. Meinen went home and his condition continued to worsen.  Id.  As a result, Mr. Meinen ended up in the hospital.  Id.  Eventually it was determined that Mr. Meinen was suffering from a form of multiple sclerosis ("MS").  See Docket No. 30-2 (D. Godfrey Depo. at 26).

Since getting sick, Mr. Meinen has struggled with his vision and has been taking antidepressants.  See Docket No. 30-4 (M. Meinen Depo. at 15-18).  Additionally, Mr. Meinen initially participated in physical and vocational rehabilitation.  However, he stopped physical rehabilitation in 2008; he participated in vocational rehabilitation for only five or six months.  Id.  (M. Meinen Depo. at 16-19).

While Mr. Meinen was in the hospital, Dan Godfrey visited Mr. Meinen and told him to concentrate on getting better and not to worry about work at Godfrey Brake.  See Docket Nos. 30-2 (D. Godfrey Depo. at 26); 30-4 (M. Meinen Depo. at 13-14).  Dan Godfrey testified that he had hoped and believed

3

that Mr. Meinen would eventually recover and would be able to return to Godfrey as a full-time employee.  See Docket Nos. 40 at ¶ 6; 30-2 (D. Godfrey Depo. at 33).  Dan Godfrey also testified that after Mr. Meinen became ill, two part-time positions were created within Godfrey Brake in order to cover the parts counter and retain a position for Mr. Meinen when he was able to return to work.  See Docket Nos. 40 at ¶ 4; 30-2 (D. Godfrey Depo. at 33).  Although Dan Godfrey asserts that these part-time positions were never intended to be permanent, Mr. Meinen disputes this fact and indicates that he was never told the position was intended to be temporary.  See Docket No. 43 at ¶ 1.

In October of 2008, ten months after Mr. Meinen fell ill, he was able to return to work at Godfrey and filled a part-time position at the parts counter. See Docket No. 30-2 (D. Godfrey Depo. at 18).  When he returned to work, Mr. Meinen presented Dan Godfrey with a doctor's opinion that he could work up to two hours per day, three days a week.  See Docket No. 40-1.  A month later, Mr. Meinen provided Dan Godfrey a slip from his doctor indicated that Mr. Meinen should be allowed to sit while at work.[1]  See Docket No. 30-4

---

[1] Mr. Meinen asserts that Godfrey provided a stool/chair for him to sit on grudgingly.  Mr. Meinen testified that Dan Godfrey told him that he did not want him standing around all the time and he did not want him sitting like a "bump on a log."  See Docket No. 30-4 (M. Meinen Depo. at 26-27, 78-79).  Dan Godfrey denies ever saying this to Mr. Meinen.  See Docket No. 30-2 (D. Godfrey Depo. at 30-31).  Mr. Vaughn testified that Dan Godfrey never complained to him about Mr. Meinen sitting on a stool and never yelled at Mr. Meinen for sitting on the stool.  See Docket No. 30-3 (Vaughn Depo. at 18-19).

(M. Meinen Depo. at 27-29).  These were the only doctor's opinions that Mr. Meinen provided to Godfrey.  Id. (M. Meinen Depo. at 25).

Some time after resuming work at Godfrey, Mr. Meinen met with Dan Godfrey and told him that he could not work more than four hours per day or twenty hours per week.[2]  Id. (M. Meinen Depo. at 32). Mr. Meinen testified that he became fatigued after working more than four hours.  Id.  Mr. Meinen also testified that upon returning to work he missed more days than he had prior to getting sick and that Godfrey worked with him on allowing him to either not come in to work or to leave early.  Id. (M. Meinen Depo. at 43-44).

While Mr. Meinen was employed in his part-time position and because of his visual impairment, Godfrey initially attempted to install special software on their existing computers to assist Mr. Meinen in the performance of his job.  Id. (M. Meinen Depo. at 38-39).  However, the software Godfrey attempted to install would not load properly.  Id.  As a result, Mr. Meinen obtained a special computer from the State of South Dakota that was designed to assist with visual impairment by enlarging the information on the screen.  Id. (M. Meinen Depo. at 37-38).  Godfrey purchased a required cable and paid a computer technician to connect Mr. Meinen's computer into their system.  See Docket No. 30-2 (D. Godfrey Depo. at 35).

---

[2] Throughout this opinion, the court accepts at face value Mr. Meinen's assertion that he was limited to working four hours per day, but the court notes that no medical evidence or opinion to that effect is in the record.

Upon returning to work at Godfrey, Mr. Meinen was supervised by Kevin Vaughn.  See Docket No. 30-3 (Vaughn Depo. at 13-14).  Mr. Vaughn testified that upon Mr. Meinen's return, Mr. Meinen required a lot of help from other Godfrey employees in seeing parts to determine what they were, in finding parts in parts catalogs, and in locating parts in the building.  Id. (Vaughn Depo. at 14).  Mr. Vaughn did not believe that Mr. Meinen was able to perform his job 100 percent and discussed this informally with Dan Godfrey.  Id. Mr. Vaughn testified that business-wise, it bothered him that other employees had to help Mr. Meinen because it was taking time away from other things that needed to be done.  Id. (Vaughn Depo. at 16).  Mr. Vaughn never did a formal performance evaluation on Mr. Meinen or any other employee; Mr. Vaughn testified that he himself never received a formal performance evaluation while employed at Godfrey.  Id. (Vaughn Depo. at 14-15).

Mr. Vaughn indicated that Mr. Meinen was pleasant to work with and that he had good interactions with other employees and customers.  Id. (Vaughn Depo. at 19-20).  Mr. Vaughn also noted that he never had any disciplinary concerns with Mr. Meinen, but testified that Mr. Meinen was not able to perform his job as required.  Id.

Mr. Meinen continued to work part-time for Godfrey until February 22, 2010, when he was discharged from Godfrey.  See Docket No. 29 at ¶ 41.  Dan Godfrey testified that a business decision was made to staff the parts

6

department with a full-time employee, as Godfrey had done prior to Mr. Meinen falling ill, rather than with two part-time employees.[3]  See Docket No. 30-2 (D. Godfrey Depo. at 54-55).  As a result, Godfrey discharged the two part-time employees who were staffing the parts counter, Mr. Meinen and Robert Nelson, and hired one full-time employee to replace them.  Id.

Dan Godfrey asked Mr. Vaughn whether Mr. Vaughn believed the part-time positions at the parts counter should be eliminated in favor of hiring a full-time employee.  See Docket No. 30-3 (Vaugn Depo. at 20-21).  Mr. Vaughn agreed that a full-time employee at the parts counter would be preferable because Mr. Meinen required a lot of help which took away from other employees' time.  Id.

Dan Godfrey testified that the decision to discharge the part-time employees and hire a full-time employee was made in part for continuity purposes.  See Docket No. 30-2 (D. Godfrey Depo. at 54-55).  Dan Godfrey noted that because there was an overlap in the schedules of the part-time employees, on occasion issues would arise where each employee believed the other was handling a particular issue, with the end result being that no one handled it.  Id.  Dan testified that it was a business decision to hire a full-time employee so that there was only one person to go to when issues arose.  Id. (D.

---

[3] Robert Nelson was the other part-time employee at the parts counter. See Docket No. 30-2 (D. Godfrey Depo. at 23).  Mr. Nelson was also discharged on February 22, 2010.  Id. (D. Godfrey Depo. at 57).

Godfrey Depo. at 56-57).  Dan Godfrey did not offer the full-time position to either Mr. Meinen or Mr. Nelson, nor did he discuss splitting the full day between the Mr. Meinen's and Mr. Nelson's schedules.  Id. (D. Godfrey Depo. at 56-58).  Dan Godfrey did testify however, that he had previously spoken with Mr. Meinen regarding the number of hours Meinen was available to work and was told by Mr. Meinen that he could not work more than 20 hours per week.  Id. (D. Godfrey Depo. at 72).[4]

Dan Godfrey also noted in his explanation to the South Dakota Department of Labor, Unemployment Compensation Division, that it would cost him less to have one full-time employee staffing the parts counter than it would two part-time employees.[5]  Id.  (D. Godfrey Depo. at 42-44).

On February 22, 2010, the day Mr. Meinen was discharged from Godfrey, Mr. Meinen had called in sick.  See Docket No. 30-4 (M. Meinen Depo.

---

[4] Dan Godfrey testified that Mr. Meinen told him he could not work more than 20 hours per week because of something to do with his disability check.  See Docket No. 30-2 (D. Godfrey Depo. at 72-73).  Kevin Vaughn, Mr. Meinen's supervisor, also testified that he was told by Mr. Meinen that he could not work more than 20 hours per week so that Mr. Meinen could claim disability benefits.  See Docket No. 30-3 (Vaughn Depo. at 12-13).  Mr. Meinen testified that he was unable to work more than four hours a day because he would become fatigued.  See Docket No. 30-4 (M. Meinen Depo. at 32).

[5] Mr. Meinen disputes that it would cost Godfrey less to employ a full-time employee than it would to employ part-time employees.  Mr. Meinen bases this assertion on the fact that full-time employees were eligible for benefits that part-time employees were not, including: bonuses, holiday pay, participation in a 401k plan, vacation time, and insurance benefits. See Docket No. 29 at ¶¶ 47-49, 51-58.

at 44-45).  Because he was sick, Mr. Meinen had his wife, plaintiff Jessie
Meinen, go to Godfrey to pick up his paycheck.  See Docket No. 30-5 (J. Meinen
Depo. at 18).  Upon arriving at Godfrey, Dan Godfrey asked Mrs. Meinen to
come into his office.  Id.  Dan Godfrey then told Mrs. Meinen that Mr. Meinen
was being let go as an employee.  See Docket No. 30-2 (D. Godfrey Depo. at 61).
Mrs. Meinen asked Dan Godfrey whether Mr. Meinen was aware he was being
let go.  Dan told her that Mr. Meinen was not yet aware.  Dan asked Jessie to
let Mr. Meinen know that he was being let go.  See Docket No. 30-5 (J. Meinen
Depo. at 18).

　　　Mrs. Meinen asked Dan Godfrey whether there was anything else Mr.
Meinen could do and testified that Dan Godfrey told her that Mr. Meinen "was
too slow and that he couldn't have his other employees wasting their time
helping" Mr. Meinen.  Id. (J. Meinen Depo. at 18-19).  Dan Godfrey testified
that he told Mrs. Meinen that it was a business decision and that Godfrey
could not afford to employ both the part-time employees and the new full-time
employee, nor could he create a job just to continue employing Mr. Meinen  See
Docket No. 30-2 (D. Godfrey Depo. at 61-62).

　　　Mrs. Meinen testified that upon receiving this news she became too upset
to drive and had to call Mr. Meinen's mother to help calm her down.  See
Docket No. 30-5 (J. Meinen Depo. at 20-21).  Mr. Meinen noted that when
Mrs. Meinen arrived at home she was bright red, could barely talk, and almost

9

fell down.  <u>See</u> Docket No. 30-4 (M. Meinen Depo. at 47).  Mrs. Meinen also missed one day of work because she was concerned about how she was going to provide for her family.  <u>Id.</u> (M. Meinen Depo. at 72).  Mrs. Meinen testified that this experience has caused her emotion distress which continues to this day and that she has good days and bad days.  <u>See</u> Docket No. 30-5 (J. Meinen Depo. at 24).

Mr. Meinen testified that as a result of being terminated from Godfrey he has suffered emotionally.  <u>See</u> Docket No. 30-4 (M. Meinen Depo. at 79-80).  Mr. Meinen testified that he has done a lot of crying and yelling, that he has gone through periods of not eating, and that he has periods when he suffers from insomnia.  <u>Id.</u>  Mrs. Meinen testified that being terminated from Godfrey has devastated Mr. Meinen.

After learning that he had been terminated from Godfrey, Mr. Meinen asked his mother, Deborah Meinen, to go to Godfrey and retrieve his personal belongings, including his computer.  <u>Id.</u> (M. Meinen Depo. at 51-52).  Upon arriving at Godfrey, Debora Meinen testified that Mr. Vaughn unplugged Mr. Meinen's computer without powering it off.  <u>See</u> Docket No. 30-6 (D. Meinen Depo. at 14-15).  However, Mr. Vaughn testified that he believed the computer was powered off when he disconnected it.  <u>See</u> Docket No. 30-3 (Vaughn Depo. at 24).  Deborah Meinen asserts that Mr. Vaughn took the disconnected computer and placed it on the asphalt next to a snow bank.  <u>See</u>

10

Docket No. 30-6 (D. Meinen Depo. at 17).  However, Mr. Vaughn testified that he believes he put the computer in the van and does not remember placing it on the ground.  See Docket No. 30-3 (Vaughn Depo. at 25).

Mr. Meinen asserts that after the computer was retrieved from Godfrey that it was wet, but that it was dried off before being powered on.  See Docket No. 30-4 (M. Meinen Depo. at 64-65).  However, Mr. Meinen testified that the computer has not worked since picking it up from Godfrey.  Id.  Mr. Meinen also testified that he has not had any computer technician examine the computer to determine why it will not function properly.  Id. (M. Meinen Depo. at 63-64).

As a result of Mr. Meinen's termination from Godfrey Brake, Mr. and Mrs. Meinen instituted this action alleging employment discrimination and wrongful termination in violation of the Americans with Disabilities Act, intentional infliction of emotional distress, and conversion.  See Docket No. 1. Mr. and Mrs. Meinen filed a motion for partial summary judgment asking for summary judgment as to liability on all their claims.  See Docket No. 28. Godfrey Brake has also filed a motion for summary judgment and asserts that Mr. and Mrs. Meinen's claims are unsupported by fact and law and asserts that Godfrey is entitled to judgment as a matter of law on all claims.  See Docket No. 36.

11

## DISCUSSION

**A.     Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law."  In determining whether summary judgment should issue, the court views the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).  In determining whether a genuine issue of material fact exists, the court views the evidence presented in light of which party has the burden of proof under the underlying substantive law.  Id.  Summary judgment will not lie if

there is a genuine dispute as to a material fact, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 247.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)).  The Supreme Court has further explained that:

> the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved **conclusively** in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

Anderson, 477 U.S. at 248-49 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968)(emphasis added)).  Essentially, the availability of summary judgment turns on whether a proper jury question is presented.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.

13

With regards to discrimination claims, the Eight Circuit recently noted, **en banc**, that notwithstanding statements in prior decisions that summary judgment should be seldom used in discrimination cases, summary judgment is not disfavored and is designed for "every action." See Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (**en banc**). Furthermore, the court noted that "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." Id. (citing Fercello v. County of Ramsey, 612 F.3d 1069, 1077 (8th Cir. 2010)).

**B.     Analysis of Mr. Meinen's ADA Claim**

Under the ADA, employers are barred from discriminating "against a qualified individual because of the disability of such individual." 42 U.S.C. § 12112(a). To establish a claim under the ADA, a plaintiff must show the following: (1) that he was a disabled person within the meaning of the ADA; (2) that he was qualified to perform the essential functions of the job either with or without accommodation; and (3) that he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. Fjellestad v. Pizza Hut of America, Inc., 118 F.3d 944, 948 (8th Cir. 1999) (citations omitted); see also Rask v. Fresenius Medical Care North Amer., 509 F.3d 466, 469 (8th Cir. 2007); Wallin v. Minnesota Dept. of Corrections, 153 F.3d 681, 686 (8th Cir. 1998).

14

If the employee satisfies this **_prima facie_** showing, the burden then shifts to the employer to show that a "legitimate, nondiscriminatory reason for the adverse employment action." Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 439 (8th Cir. 2007) (citing McDonnell Douglas Corp. V. Green, 411 U.S. 792, 802-03 (2003)).  Finally, to prevail, the employee must "show that the defendant's proffered reason was a pretext for discrimination." Dovenmuehler, 509 F.3d at 439 (citing McDonnell, 411 U.S. at 802-03).

### 1.    Whether Mr. Meinen is a Disabled Person Under the ADA

The ADA defines a person disabled under the Act as follows:  (A) physical or mental impairment that substantially limits one or more major life activities; (B) a record of having such impairment; or (C) being regarded as having such an impairment.  See 42 U.S.C. § 12102(1).

Mr. Meinen was diagnosed with a form a multiple sclerosis ("MS"). Godfrey does not dispute that Mr. Meinen suffers from MS nor does Godfrey dispute that MS is a disability which is recognized by the ADA.  See Docket No. 34 at 2.  Additionally, Mr. Meinen asserts that MS substantially limits him in major life activities because he has some vision difficulties, has some difficulty performing manual tasks, standing, and working.  See Docket No. 31 at 6. Godfrey does not dispute that Mr. Meinen has some physical limitations as a result of his MS.  Therefore, Mr. Meinen has satisfied the first element under the ADA.

**2.    Whether Mr. Meinen was Qualified to Perform the Essential Functions of the Job with or without Reasonable Accommodation**

It is the plaintiff's burden to demonstrate two factors in order to show that he is qualified.  First, the plaintiff must show that he satisfies "the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Weiler v. Household Finance Corp., 101 F.3d 519, 524 (7th Cir. 1996) (quoting 29 C.F.R. app. § 1630.2(m)).  This factor is undisputed by the parties.  Second, the plaintiff must show that he was able to "perform the essential functions of the position held or desired, with or without reasonable accommodation." Id. (quoting 29 C.F.R. app. § 1630.2(m)).  This factor is disputed.

Mr. Meinen asserts that he was not terminated as a result of failing to perform his job duties.  See Docket No. 31 at 7.  Rather, Mr. Meinen asserts that he was able to perform the essential functions of his part-time position with the accommodations provided by Godfrey, including working only four hours per day, connecting his computer into Godfrey's computer system to aid his vision, and by having a stool for him to sit on while at work.  Id. Mr. Meinen asserts that this shows he was able to perform the essential functions of his job with reasonable accommodations.

Godfrey asserts that it made a business decision to eliminate all the part-time positions at the parts counter in favor of staffing the parts counter with a

16

full-time employee.  As a result, Godfrey asserts that Mr. Meinen is not qualified to perform the essential functions of the job because Mr. Meinen cannot work more than four hours a day and thus cannot fulfill the requirements of the full-time position.  Mr. Meinen counters by asserting that Godfrey was not free to take away the part-time accommodation absent showing an undue burden.  Additionally, Mr. Meinen alleges that Godfrey failed to engage in the interactive process with him prior to terminating him in February of 2010.

Mr. Meinen cites Peyton v. Fred's Stores of Ark., Inc., 561 F.3d 900, 902 (8th Cir. 2009), for the proposition that the creation of a part-time position is a reasonable accommodation.  However, the Peyton decision did not establish that proposition.  In Peyton, the Eighth Circuit considered whether a plaintiff, who had become ill from cancer and had to take an extended leave from work, was qualified to perform the essential functions of her job with or without accommodation.  Id. at 901.  After becoming ill from cancer, the plaintiff in Peyton took an extended leave of absence.  Id.  After the plaintiff was discharged, she brought suit against her employer claiming she was discriminated against in violation of the ADA because her employer failed to engage in the interactive process to consider her request to grant her a leave of absence for a indefinite period of time.  Id.

17

The Peyton court affirmed summary judgment for the employer, holding that an employee who was indefinitely unavailable was not able to perform the essential functions of the job.  Id. at 903.  The Eighth Circuit did not hold as a matter of law that the creation of a part-time position was a reasonable accommodation.  Rather, the Eighth Circuit merely cited to the ADA's definition of "reasonable accommodation," which indicates that "a reasonable accommodation **may** include 'job restructuring, part time or modified work schedules, reassignments to a vacant position...' " Id. at 902 (quoting 42 U.S.C. § 12111) (emphasis added).

Godfrey cites Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998),[6] for the proposition that an employer is not required to create part-time positions as an accommodation to disabled employees.  In Terrell, plaintiff brought suit against her employer under the ADA, alleging that the employer failed to reasonably accommodate her carpal tunnel syndrome.  Id. at 623-24.  In Terrell, the employer had a policy which allowed injured workers to work on "limited duty" for up to sixty days.  Id. at 623.  The plaintiff in Terrell had exceeded the sixty-day limit and was thereafter placed on unpaid medical leave.  Id.  At the time the plaintiff was placed on unpaid medical leave, the employer had no permanent part-time positions because the part-time

_____

[6] The parties refer to Terrell as an Eighth Circuit case.  However, Terrell was decided by the Eleventh Circuit.

positions had been discontinued years earlier.  Id.  However, the employer

thereafter opened several part-time positions and plaintiff was recalled as a

part-time employee.  Id.

After being recalled, plaintiff and the other part-time employees worked

four-hour shifts until the employer lengthened the part-time shifts to five

hours.  Id. at 624.  Initially, plaintiff worked the new five-hour shifts until her

doctor recommended that she work only four hours per day.  Id.  Plaintiff's

employer then allowed plaintiff to work only four hours per day.   Id.

Plaintiff subsequently brought suit against her employer arguing that the

employer failed to reasonably accommodate her when they placed her on

unpaid medical leave and by refusing to place her in a part-time position after

she exhausted her sixty-day "limited duty" work.  Id. at 625.  The Eleventh

Circuit held that an employer is not required to create a part-time position for a

disabled employee when no part-time position exists.  Id. at 626.  The Eleventh

Circuit noted that although the ADA

> statutes and regulations list ("may include") part-time work as a potential
> reasonable accommodation, we do not accept that this list means part-
> time work is always a reasonable accommodation.  The ADA's use of the
> word 'reasonable' as an adjective for the word 'accommodate' connotes
> that an employer is not required to accommodate an employee in any
> manner in which the employee desires. This is so because the word
> 'reasonable' would be rendered superfluous in the ADA if employers were
> required in every instance to provide employees the 'maximum
> accommodation' or every conceivable accommodation possible.

Id. (internal quotations and citations omitted).

19

The Eleventh Circuit went on to note that "whether an accommodation is reasonable depends on specific circumstances." Id.  The court held that because the employer had no part-time positions available when plaintiff was placed on unpaid medical leave that it was unreasonable to expect the employer to create a part-time position to accommodate the plaintiff.  Id. Additionally, the court stated:

> Whether a company will staff itself with part-time workers, full-time workers, or a mix of both is a core management policy with which the ADA was not intended to interfere.  Instead employers are only required to provide "alternative employment opportunities reasonably available under the employer's existing policies."

Id. at 626-27. (quoting Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 289 n.19 (1987)).  Finally, the Eleventh Circuit noted that "the intent of the ADA is that an employer needs only to provide meaningful ***equal*** employment opportunities" and that the "ADA was never intended to turn nondiscrimination into discrimination." Id. at 627.

The Eighth Circuit cited with approval the proposition set forth in Terrell that an employer is not required to "create a new part-time position where none previously existed." Treanor v. MCI Telecomm. Corp., 200 F.3d 570, 575 (8th Cir. 2000) (citing Terrell, 132 F.3d at 626).  In the Treanor decision, the plaintiff took an extended medical leave of absence due to depression, chronic fatigue, and resulting concentration difficulties. Id. at 572.  When she was ready to resume work, she requested that she be placed in a part-time position

20

as a reasonable accommodation to her.  Id.  The employer initially placed Treanor in a part-time position that was different from the position she had previously occupied.  Id.  After a second and more-lengthy medical leave of absence, Treanor again requested that she be placed in a part-time position. Id. at 572-73.  No part-time positions existed at this time and Treanor's employment was subsequently terminated.  Id. at 573.

Treanor alleged that her employer discriminated against her by not placing her in a part-time position.  Id. at 575.  The court acknowledged that "part-time work and job restructuring may be considered reasonable accommodations," but that an employer is not required to offer those accommodations in every case.  Id.  Treanor had not shown that any part-time position was available after her second leave of absence.  Id.  In addition, the court held that the employer was not required to create a new part-time position where none previously existed.  Id.

Based on these cases, it is clear that Godfrey was not required to create a part-time position for Mr. Meinen at the parts counter upon Mr. Meinen's return to employment at Godfrey if no such part-time position existed at the time.  None did.

Prior to Mr. Meinen's illness, he was employed as a full-time employee at Godfrey's parts counter.  See Docket No. 30-4 (M. Meinen Depo. at 7-8).  After Mr. Meinen became ill, Dan Godfrey testified that he turned Mr. Meinen's full-

21

time position at the parts counter into two part-time positions to accommodate Mr. Meinen's work schedule.  See Docket No. 30-2 (D. Godfrey Depo. at 33-34). Dan Godfrey employed Robert Nelson as one part-time employee at the parts counters and held the other part-time position open for when  Mr. Meinen would be able to return to work.  Dan Godfrey also testified that he never intended the part-time positions to be permanent, but that he created the positions with the understanding that Mr. Meinen would eventually be able to return to full-time employment.

Dan Godfrey never told Mr. Meinen that the position was temporary–or for that matter that it was permanent.  Neither did Dan Godfrey follow-up with Mr. Meinen regarding his overall health condition during the 18 months Mr. Meinen held the part-time position.  However, Dan Godfrey did work with Mr. Meinen in creating his schedule and the number of hours he was able to work.  Over the next 18 months, Mr. Meinen was not able to work more than four hours a day or 20 hours per week nor is Mr. Meinen currently able to work more than 20 hours per week.

In February of 2010, Dan Godfrey testified that he made a business decision to discharge all part-time employees at the parts counter and to instead employ one full-time employee.  Dan Godfrey testified that he made this decision in part to have continuity at the parts counter and because he could not afford to employ both the two part-time employees and a full-time

22

employee.  As a result, Mr. Meinen and Mr. Nelson were let go and a full-time employee was hired to cover the parts counter.  Dan Godfrey did not offer the full-time position to either Mr. Meinen or Mr. Nelson, but testified it was his understanding the neither Mr. Meinen nor Mr. Nelson were able to work more than their part-time schedules.

Based on these facts, it appears that Godfrey created and offered the part-time position to Mr. Meinen as a reasonable accommodation.  However, Godfrey asserts that it did so temporarily with the understanding the Mr. Meinen would be able to return to full-time employment at some time. Godfrey asserts that it was not required to maintain a permanent part-time position indefinitely and that it is entitled to make decisions that are in the best interests of the company, including whether to continue employing part-time employees or full-time employees.  Godfrey asserts that a holding to the contrary would require Godfrey to permanently employ part-time workers at the parts counter even if doing so worked a detriment to the company.

Mr. Meinen argues that Godfrey was not free to withdraw the part-time position once he had created the position and allowed Mr. Meinen to occupy the position for 18 months unless it created an undue burden on Godfrey. Mr. Meinen asserts that Godfrey has not shown that permanently employing him in the part-time position was an undue burden.  Additionally, Mr. Meinen asserts that Godfrey did not engage in the interactive process to determine

23

whether any other reasonable accommodation was available to allow

Mr. Meinen to continue working at Godfrey.  Thus, the issue becomes whether

an employer can withdraw a reasonable accommodation when business

circumstances change or whether the employer is required to maintain the

reasonable accommodation indefinitely.

> **a.    Whether an employer can withdraw a reasonable accommodation**

In <u>Howell v. Michelin Tire Corp.</u>, 860 F.Supp. 1488, 1490 (M.D. Ala.

1994), a plaintiff, who suffered from hip dysplasia, brought a claim under the

ADA against his employer alleging that the employer discriminated against him

by refusing to reassign him to a permanent light duty job.  The plaintiff argued

that by failing to do so, his employer failed to "reasonably accommodate" his

condition.  <u>Id.</u>  The employer argued that it had accommodated the plaintiff by

temporarily reassigning him to light-duty work on two different occasions and

had provided the plaintiff with a chair to sit on rather than standing all day as

was required of other employees.  <u>Id.</u> at 1492.  The district court held that

"reasonable accommodation" did not require an employer to turn a temporary

light-duty position into a permanent position.  <u>Id.</u>  However, the court noted

that "if a light-duty job is a permanent job, the assignment to the job must be

for the entire time the job exists."  <u>Id.</u>

In another case, <u>Hatchett v. Philander Smith College</u>, 251 F.3d 670, 675 (8th Cir. 2001), the Eight Circuit held that an employer is not required to reallocate essential functions that an individual must perform in order to accommodate a disabled employee.  "Furthermore, an employer is not required to hire additional employees or assign those tasks that the employee could not perform to other employees."  <u>Id.</u>  Hatchett was able to open mail, answer the phone, and sign checks, but she was not able to perform other facets of the college's Business Manager position, even if her hours were limited.  <u>Id.</u>

In <u>Brooks v. Lab. Corp. of America</u>, 2005 WL 2250827, *14 (W.D. Mo. 2005), the court held that "an employee who has a full-time position, but who is only able to return to work on a part-time basis, is not qualified to perform the essential function of their full-time position." (Citing <u>Hatchett</u>, 251 F.3d at 673-75).  There, a plaintiff was returning from a medical leave of some months and asserted that her employer should have accommodated her by allowing her to work four-hour days.  <u>Id.</u>

In <u>Nance v. Quickrete Co</u>, 2007 WL 1655154, **2-5 (W.D. Va. 2007), the court held that "an employee who can only work part-time is not a qualified individual with a disability under the ADA if full time work is essential to the job."  In <u>Nance</u>, the plaintiff drove truck delivering concrete products for the employer and was only able to work 10- to 11-hour shifts.  <u>Id.</u>  However, due to the seasonal nature of the business, the employer required all its truck drivers

to work 14-hour shifts, which generally allowed them to make three deliveries a day.  Id.  The district court held that it could not require an employer to permanently accommodate a reduced schedule for the employee even if the employer had accommodated such a schedule for an extended period of time. Id. at *5.  In Nance, the employer had allowed the employee to work a reduced schedule for ten months prior to terminating him.  Id. at *2.  Summary judgment was granted in the employer's favor because Nance's inability to work 14-hour shifts rendered him not qualified to do the job.  Id. at *5.

Finally, other circuit courts of appeal have held that an employer is not required to employ a disabled person indefinitely simply because the employer chose to accommodate the disabled employee for a period of time.  In Miller v. Bon Secours Baltimore Health Corp., 194 F.3d 1305 (table), 1999 WL 731098, *1 (4th Cir. 1999), the plaintiff suffered from Graves' disease and had difficulty working in a position that required use of a computer.  As a result of the disability, plaintiff's employer offered plaintiff a position that only required plaintiff to work 24 hours per week instead of 40, but that did not require the use of a computer.  Id.  Plaintiff worked in this position for approximately 19 months without incident at which time she was told that her position was being eliminated.  Id.  Plaintiff then brought an action under the ADA against her employer alleging that she was constructively discharged because of her disability.  Id. at *2.

26

The district court held that plaintiff had not created a genuine issue of material fact regarding whether she was discharged in violation of the ADA.  Id. Rather, the district court held that plaintiff's claim that the employer "wrongfully withdrew its reasonable accommodation of her disability was based on the legally unsupportable theory that an employer that offers an accommodation to an employee's disability and subsequently alters it violated the ADA."  Id.

Plaintiff subsequently appealed to the Fourth Circuit, challenging the district court's finding that she was not constructively discharged.  On appeal, the Fourth Circuit affirmed the district court's decision and held that "to the extent that [plaintiff] contends that she is somehow entitled to lifetime employment because her position was created as an accommodation for her disability is incorrect."  Id. at *3. (citing Still v. Freeport-McMoran, Inc., 120 F.3d 50, 53 (5th Cir. 1997) (explaining that employer would have no duty under the ADA to provide a disabled employee with a new job when his job was eliminated for reasons unrelated to his disability)).

An analogous Supreme Court case involves an employer which unknowingly accommodated its disabled employee for a period of time and then fired the employee when the disability came to light.  In Albertson's, Inc. v. Kirkingburg, 527 U.S. 555 (1999), the plaintiff was hired as a commercial truck driver for Albertson's.  Id. at 558.  Albertson's was bound by certain

27

regulations of the Department of Transportation ("DOT") requiring that its commercial truck drivers meet certain visual acuity standards.  Id. at 558-59. Plaintiff was initially hired due to an erroneous doctor's opinion that certified that he met the DOT vision standards when, in fact, he did not.  Id.  Over two years later, a second eye exam correctly concluded that plaintiff's eyesight did not meet the DOT standards.  Id. at 559.

A few months before this discovery was made as to plaintiff's eyesight, the DOT promulgated a waiver program for the visual acuity standards, allowing drivers with deficient vision to obtain a waiver from the visual acuity requirement if they could show three years of recent commercial driving experience with no adverse incidents.  Id. at 560.  Plaintiff applied for a waiver, but Albertson's fired him because he did not meet the DOT standards.  Id.  The DOT later granted plaintiff the waiver, but Albertson's refused to rehire him. Id.[7]  The key issue was whether the plaintiff was qualified for his job–whether he was able, with or without reasonable accommodation–to perform the essential functions of his job.  The Supreme Court held that he was not, notwithstanding the fact that the plaintiff ultimately obtained a waiver from the DOT as to the visual acuity requirement.  Id. at 577-78.  The Court rejected plaintiff's argument that he was qualified to perform the essential functions of

---

[7] The DOT later abandoned the waiver experiment.

28

his job with reasonable accommodation as evidenced by the fact that he had been performing his job for Albertson's two years before he was fired.  Id. at 567 n.13.

Based on the above cases, the court finds that Godfrey was not required to make the temporary part-time position for Mr. Meinen permanent when Godfrey concluded that Mr. Meinen would be unable to return to full-time employment.  See Howell, 860 F.Supp. at 1490; Nance, 2007 WL 1655154, **4-5 .  Neither was Godfrey required to continue to provide Mr. Meinen with assistance from other employees in performing the essential functions of his job. See  Hatchett, 251 F.3d at 675.  Mr. Meinen conceded that upon returning to work he had to ask other employees on occasion to assist him in the performance of his job.  See Docket No. 30-4 (M. Meinen Depo. at 43).  Kevin Vaughn, Mr. Meinen's supervisor, testified that Mr. Meinen required a lot of help from other people in the business, including looking up parts in part catalogs and finding parts in the building.  See Docket No. 30-3 (Vaughn Depo. at 14-16)  Mr. Vaughn testified that this took away from the other employees' abilities to accomplish their own responsibilities.  Id.

Additionally, Godfrey was not required to permanently staff the parts counter with part-time employees simply because the part-time position was created as an accommodation for Mr. Meinen and even though Mr. Meinen held

the part-time position for 18 months.  See Nance, 2007 WL 1655154, *4-5.  Cf. Kirkingburg, 527 U.S. 567 n.13.

Finally, Mr. Meinen's assertion that Godfrey could not withdraw the accommodation is unsupported by case law.  Mr. Meinen was not entitled to life-time employment with Godfrey simply because Godfrey chose to accommodate his disability--as long as the position was eliminated for reasons unrelated to his disability.  See Miller, 194 F.3d at *1; Still, 120 F.3d at 53.  Additionally, Godfrey was not required to base its business decisions around indefinitely maintaining Mr. Meinen as a part-time employee.  Godfrey determined that it was in the best interest of the business to staff the parts counter with a full-time employee.  It is Mr. Meinen's burden to show that he can perform the essential functions of his former job, with or without accommodation.  Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1113 (8th Cir. 1995).  He has failed to create a genuine issue of material fact as to that issue.  The court concludes that Mr. Meinen is not qualified to perform the essential functions of the full-time position.

> **b.    Whether Godfrey engaged in the interactive process with Mr. Meinen**

Mr. Meinen also asserts that Godfrey acted in bad faith by failing to engage in the interactive process prior to discharging him.  In order to show that the employer failed to engage in the interactive process, the plaintiff must

show:  (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.  See Peyton, 561 F.3d at 902.  It is incumbent on the employee to initiate the interactive process, except perhaps in cases involving mental illness where the employee does not know how to ask for accommodation.  Id. (citing Fjellestad, 188 F.3d at 952); E.E.O.C. v. Convergys Customer Management Grp., Inc., 491 F.3d 790, 795 (8th Cir. 2007) (employers and employees have a "shared responsibility" to resolve requests for accommodation, but the employee must initiate the process by requesting an accommodation).

There is no "per se" liability under the ADA if an employer fails to engage in the interactive process.  Alexander v. Northland Inn, 321 F.3d 723, 728 (8th Cir. 2003) (quoting Fjellestad, 188 F.3d at 952).  Instead, an evidentiary presumption of bad faith arises as to the employer's motives.  Fjellestad, 188 F.3d at 952.

Here, it is clear that defendant engaged in the interactive process after Mr. Meinen's diagnosis and prior to his discharge on February 22, 2010.  The first accommodation was allowing Mr. Meinen to take 10 months leave.  See Haschmann v. Time Warner Entertainment Co., 151 F.3d 591, 602 (7th Cir.

1998) (allowing plaintiff medical leaves of absence is one form of accommodation for a disability).  Defendant also attempted to install software to assist Mr. Meinen to see.  When that did not work, it allowed Mr. Meinen to bring in a special computer and hook it up to defendant's system.  Defendant also provided a stool for Mr. Meinen to sit on, allowed other co-workers to assist Mr. Meinen in performing his job, allowed Mr. Meinen to miss days or leave early when he felt ill, and most importantly, defendant allowed Mr. Meinen to work part-time.  The issue presented, then, is whether a presumption of bad faith arises when an employer has previously engaged in the interactive process, but failed to engage in the interactive process at the time it terminated the employee's employment.

The facts in the Buboltz case are instructive.  See Buboltz v. Residential Advantages, Inc., 523 F.3d 864 (8th Cir. 2008), abrogated on other grounds, Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (**en banc**).[8] Buboltz was legally blind and was hired by Residential Advantages, Inc. ("RAI"), to provide residential services to disabled persons who could not live independently.  Id. at 866-67.  Although a usual job responsibility for employees in Buboltz's position was to provide transportation for residents, RAI

---

[8]The Torgerson court overruled the holding in Buboltz and other panel decisions of the Eighth Circuit which had held that a special standard applied in summary judgment motions in discrimination cases.  Torgerson, 643 F.3d at 1043.

waived the driving requirement as an accommodation for Buboltz's disability. Id.

Concerns later arose about Buboltz's ability to do her job given her disability. Id. at 867. Specifically, others observed Buboltz feeling the crotch of one of the residents to see if they had urinated on themselves, holding documents upside down when attempting to read them, taking a long time to read, and failing to realize the presence of another person who was in the same office as Buboltz. Id. After these concerns arose, RAI told Buboltz that she could no longer dispense medications to residents and could not work alone with them. Id. at 867. Buboltz met with RAI to discuss RAI's concerns. Id. Buboltz said during the meeting, "I have, like, numerous devices that I can use." Id. RAI refused to change its new restrictions on Buboltz. Id. These restrictions resulted in friction between Buboltz and her co-workers because it placed additional burdens on the co-workers. Id. Coterminous with these new restrictions, RAI also began requiring Buboltz to work every other weekend, a requirement that also applied to all other employees in Buboltz's position. Id. Buboltz resigned and asserted a charge of disability discrimination. Id.

In analyzing Buboltz's claim that RAI failed to accommodate her disability, the Eighth Circuit affirmed the district court's grant of summary judgment in favor of RAI. Id. at 870. The court held that, although an employer is required to engage in the interactive process to determine if a

33

reasonable accommodation can be made, the burden is on the employee to request that accommodation in the first place.  Id.  Although the employer already knew of Buboltz's disability and had previously given her a reasonable accommodation in the matter of her driving requirements, the Eighth Circuit dismissed Buboltz's claim because she did not request reasonable accommodation anew when RAI told her of the additional restrictions on her work that it was instituting.  Id.

The court held that Buboltz's statement "I have, like, numerous devices that I can use" was reasonably understood to assert that she could do her job–including dispensing medications and supervising residents alone–without any accommodation from RAI.  Id.  Thus, Buboltz's failure-to-accommodate claim failed because she failed to request additional reasonable accommodation.  Id.

In a similar vein is Russell v. TG Missouri Corp., 340 F.3d 735 (8th Cir. 2003).  In that case, the plaintiff suffered from a mental disability.  Id. at 742.  Her doctor wrote a note to the employer advising that the plaintiff not work more than 8 hours per day.  Id.  The employer accommodated this limitation by requiring Russell to work only 8 hours per day, but she worked 6 days per week.  Id.  The Eighth Circuit held that the doctor's not could not be reasonably understood to limit the total number of days per week that Russell could work, only the number of hours per day.  Id.  Thus, the court held, it was

incumbent upon Russell to make a further request for a limitation on the number of days per week, if that was what was required as a reasonable accommodation.  Id.  The court held Russell–not her employer--responsible for stalling the interactive process because she failed to make an additional request for an accommodation regarding the total number of days per week that she worked.  Id.

This court concludes that no presumption of bad faith arises due to defendant's failure to engage in the interactive process at the time it terminated Mr. Meinen.  Under Buboltz and Russell, it was incumbent on Mr. Meinen to request anew reasonable accommodation at the time Dan Godfrey told him (told his wife) that it was terminating the two part-time positions.  Mr. Meinen did not make an additional request for additional reasonable accommodation at this time, nor at any time after learning of his termination.  This is fatal to his failure-to-accommodate claim.  Buboltz, 523 F.3d 870; Russell, 340 F.3d at 742.

This is especially true where, as in this case, Mr. Meinen never provided to defendant any medical documentation of his inability to work more than four hours per day.  See Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1045 (8th Cir. 2005) (employee failed to hold up her end of the interactive process by not providing employer with medical information necessary to determine whether or how the employee could use certain machines); Russell, 340 F.3d at 742

35

(employee's doctor told employer that employee's disability limited her to working 8 hours a day, but employee did not provide medical documentation imposing a limit on the number of days per week that employee could work).

The court concludes that Godfrey, in good faith, engaged in the interactive process and afforded Mr. Meinen reasonable accommodations during the time which Mr. Meinen was employed at Godfrey.  Mr. Meinen's assertion that Godfrey had a duty to offer him another reasonable accommodation prior to his termination must fail because Mr. Meinen has failed to show that he requested a reasonable accommodation after learning of his termination.

Therefore, this court finds that Godfrey's decision to employ a full-time employee at the parts counter and to discharge all part-time employees was justified as long as the motivation behind the decision was unrelated to Mr. Meinen's disability.  No presumption of bad faith arises as to Godfrey's motive as a result of the fact that it engaged in no interactive process at the time of termination.

### c.   Whether Godfrey has shown an undue burden to accommodate Mr. Meinen

Mr. Meinen asserts that Godfrey could not discharge him absent a showing of undue hardship.  Under the ADA, "a covered entity is required, absent undue hardship, to provide a reasonable accommodation to an

otherwise qualified individual who meets the definition of disability" under the ADA.  29 C.F.R. § 1630(o)(4).

"Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity." 29 C.F.R. § 1630(p)(1).  The factors to be considered in determining whether an accommodation would impose an undue hardship include: (1) the nature and net cost of the accommodation; (2) the overall financial resources of the facility in the provision of the reasonable accommodation, the number of persons employed, and the effect on the expenses and resources, or the impact of such accommodation upon the operation of the facility; (3) the overall size of the business; (4) the type of operation of the covered entity, including the composition, structure, and function of its workforce; and (5) the impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact of the facility's ability to conduct business.  See 29 C.F.R. § 1630.2(p)(2)(i-v); 42 U.S.C. § 12111(10)(B)(i-iv).

In this case, it is clear that Godfrey provided Mr. Meinen with reasonable accommodations.  Even with those reasonable accommodations, both Mr. Meinen and Mr. Vaughn testified that other Godfrey employees were required to help Mr. Meinen in the performance of his job.  Mr. Vaughn testified that this took away from the other employees' abilities to perform their

own responsibilities.  Additionally, as discussed above, Godfrey was not required to offer Mr. Meinen lifetime part-time employment simply because Godfrey intended to temporarily accommodate Mr. Meinen's disability.  To make such a finding would eliminate Godfrey's ability to make business decisions which Godfrey believes to be in the best interest of the company.  The ADA was not intended to be an insurance policy for disabled persons, and employers are not asked to make unreasonable accommodations to continue employing a disabled employee.

The burden is on Godfrey to demonstrate that the accommodation requested would impose an undue hardship on the operation of the business.  Fjellestad, 188 F.3d at 951.  Godfrey has not shown that continued employment of Mr. Meinen on a part-time basis would have resulted in an undue burden on Godfrey.  The court does not have sufficient facts before it to determine whether having other employees assist Mr. Meinen in the performance of his job amounted to an undue burden.  Neither party has provided any information as to Godfrey's financial resources, the size of the business, the number of employees, or the cost (in time or money) associated with having other employees assist Mr. Meinen in carrying out his responsibilities.  Therefore, this court cannot find that Godfrey has established that it would be an undue burden to continue employing Mr. Meinen part-time.

### 3.   Whether Mr. Meinen Suffered an Adverse Employment Action Under Circumstances Giving Rise to an Inference of Discrimination

Even if Mr. Meinen could establish that he was qualified for the position with reasonable accommodations, Mr. Meinen must still establish that he suffered an adverse employment action because of his disability.  Buboltz, 523 F.3d at 868.  Termination is an adverse employment action.  Id.  What is at the crux of the parties' dispute is whether that termination was "because of his disability."

"[W]hile reviewing the employer's articulated reasons for discharge and the plaintiff's refutations thereof, [this court] must keep in mind that federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.  Rather, [this court's] inquiry is limited to whether the employer gave an honest explanation of its behavior."  Wiling v. Cnty of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998).  "Accordingly, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."  Id.; see also Clay v. Hyatt Regency Hotel, 724 F.2d 721, 725 (8th Cir. 1984) ("While an employer's judgment may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was pretext for illegal discrimination.").

Mr. Meinen asserts that Godfrey discharged him after Godfrey determined that Mr. Meinen would be unable to return to full-time employment.  Mr. Meinen asserts that this shows that Godfrey's decision to employ full-time staff was motivated by Mr. Meinen's disability.

In reviewing the facts of the case, the evidence shows that Mr. Meinen is unable to work more than four hours per day.  Additionally, it is undisputed that prior to Mr. Meinen becoming ill, Godfrey employed only full-time staff at the parts counter.  Dan Godfrey testified that he did not intend the part-time position created for Mr. Meinen after he became ill to become a permanent position.  Rather, the position was intended to allow Mr. Meinen to work part-time until he could return to full-time employment.  Furthermore, it is undisputed that Mr. Meinen would not be able to return to full-time employment.  As a result, after employing Mr. Meinen for 18 months in a part-time capacity, Godfrey asserts that it made a business decision to employ one full-time employee because Godfrey believed it would be more efficient and productive for the company to go back to employing a full-time employee in the parts position as it had prior to Mr. Meinen's illness.

Based on this determination, Godfrey elected to discharge all part-time employees at the parts counter in favor of employing one full-time employee.  Mr. Meinen, an individual with a disability, was discharged as was the other

40

part-time employee, Robert Nelson, who did not suffer from a disability.[9]  Dan
Godfrey did not offer the full-time position to Mr. Meinen.  However,
Mr. Meinen himself testified that he would be unable to work a full-time
position because he became fatigued after working a four-hour shift.
Additionally, both Dan Godfrey and Mr. Vaughn testified that they believed
Mr. Meinen would not work more than four hours a day because it would have
interfered with his eligibility to collect disability benefits.

Mr. Meinen has not presented evidence to show that his discharge was
the result of his disability.  Rather, the evidence shows that Godfrey made
several accommodations for Mr. Meinen by creating a part-time position with
the hope the Mr. Meinen would eventually be able to return to work full-time,
by providing Mr. Meinen with a stool to sit on during work when other
employees were not allowed to sit on the job, and by purchasing required
cables and paying a computer technician to connect Mr. Meinen's computer to
Godfrey's computer system to assist Mr. Meinen in the performance of his job.

That Godfrey determined it was more efficient and productive to employ
one full-time employee rather than two part-time employees is a business
decision.  Godfrey asserts that it determined a full-time employee was
necessary for continuity purposes.  Dan Godfrey noted that because there was

---

[9] Mr. Meinen asserts that Robert Nelson was disabled within the meaning
of the ADA.  However, Mr. Meinen offers no evidence to support this assertion.

an overlap in the schedules of the part-time employees, Mr. Meinen and Mr. Nelson, on occasion issues would arise where each employee believed the other was handling a particular issue.  Dan Godfrey believed that it would be more efficient to employ one full-time employee who would be at the counter all day and whom Dan Godfrey could go to when issues arose.  Additionally, Dan Godfrey testified that he believed it would be more cost-efficient to employ one full-time employee rather than two part-time employees.[10]

This court is not in the position to determine whether the business decision was "wise, fair, or even correct."  See <u>Wiling</u>, 53 F.3d at 873.  Rather, this court must determine whether Godfrey's explanation is a mere pretext to cover up a discriminatory motive.  Based on the record in this case, the court cannot say that Godfrey's explanation was a mere pretext to cover up illegal discrimination.  Prior to Mr. Meinen's illness, Godfrey staffed the parts counter with a full-time employee.  Dan Godfrey determined that it would be best for the business to return to full-time staffing.  Godfrey's decision not only affected Mr. Meinen but had an equal impact on Robert Nelson, a non-disabled employee.  There is no indication in the record to show that Mr. Meinen was

---

[10] Mr. Meinen refutes the fact that it was more cost efficient to employ one full-time employee because full-time employees were entitled to benefits that part-time employees were not.  Thus, Mr. Meinen asserts that it actually costs Godfrey more to employ one full-time employee than it does to employ two part-time employees.

treated differently than other part-time non-disabled employees when the decision to terminate all the part-time positions was made.  Rather, the record reflects that Godfrey made several accommodations to allow Mr. Meinen to continue his employment after he was diagnosed with MS.

Based on the record before this court, the court finds that Godfrey's decision to eliminate all the part-time positions at the parts counter in favor of employing one full-time employee at the parts counter was based on reasons unrelated to Mr. Meinen's disability.  The court concludes that while Mr. Meinen's termination is certainly an adverse employment action, Mr. Meinen has failed to show that the decision to terminate him was premised on his disability.  Therefore, the court recommends granting summary judgement in favor of Godfrey and denying Mr. Meinen's motion for partial summary judgment.

––––––––––––––––––––––––––––––––––––––––––

The Americans with Disabilities Act was intended to have broad remedial coverage, to open up employment opportunities for disabled persons that were not previously available due to outdated biases and stereotypes.  See Pub. L. No. 110-325 at § 2(a)92).  To accomplish these goals of the ADA, employers should be encouraged to experiment to try to find reasonable accommodations for disabled employees, but they must be given flexibility to abandon "failed experiments" where accommodations did not work out as hoped.  Kirkingburg,

527 U.S. at 558-60, 567 n.13, 577-58; <u>Hatchett</u>, 251 F.3d at 675; <u>Treanor</u>, 200 F.3d at 575; <u>Miller</u>, 194 F.3d 1305, 1999 WL 731898 at ** 1-2; <u>Terrell</u>, 132 F.3d at 626-27; <u>Howell</u>, 860 F. Supp. at 1490; <u>Nance</u>, 2007 WL 1655154 at ** 2-5; <u>Brookes</u>, 2005 WL 1655154 at ** 2-5.  The ADA is not intended to discourage employers from experimenting with possible reasonable accommodations, though those experiments might ultimately fail.  <u>E.E.O.C. v. Humiston-Keeling, Inc.</u>, 227 F.3d 1024, 1026 (7th Cir. 2000).

Here, the record is clear that Godfrey Brake attempted to accommodate Mr. Meinen's disability–did in fact accommodate that condition in many substantive and substantial ways.  Whether Godfrey offered Mr. Meinen part-time employment with the intent that it be a temporary arrangement, or whether it hoped from the outset that the part-time arrangement could work out permanently, Godfrey later decided after the experiment had run its course for 18 months that it was not working out.  That the company made a business decision on neutral grounds to discontinue the experiment is not actionable under the ADA.  If courts punished employers for attempting, but failing, to accommodate disabled employees, courts encourage employers not to make the attempt in the first place.

Mr. Meinen's position at Godfrey before he became ill had always been full-time.  Godfrey could easily have stood firm on the full-time requirement and refused to give Mr. Meinen a position with the company when he was ready

to return to work part-time.  That would be a cleaner, more clear case in favor

of Godfrey.  That the company attempted, in good faith, to find a solution that

worked for both Mr. Meinen and itself should not provide the makings of

Godfrey's liability.

C.    **Intentional Infliction of Emotional Distress**

Both parties have moved for summary judgment in their favor on

Mr. Meinen's intentional infliction of emotional distress ("IIED")claim.  Plaintiffs

seek judgment in their favor on the issue of liability only, defendant seeks

summary judgment in its favor on the entire claim.

The tort of IIED is a common law claim governed by South Dakota state

law.[11]  A plaintiff asserting an IIED claim must show four elements:  "(1) an act

by the defendant amounting to extreme and outrageous conduct; (2) intent on

the part of the defendant to cause the plaintiff severe emotional distress; (3) the

defendant's conduct was the cause in-fact of plaintiff's distress; and (4) the

plaintiff suffered an extreme disabling emotional response to defendant's

conduct."  Fix v. First State Bank of Roscoe, 2011 S.D. 80, ¶ 19, 807 N.W.2d

612, 618 (quoting Anderson v. First Century Fed. Credit Union, 2007 S.D. 65,

_____

[11]Although this court's subject matter jurisdiction is founded on the
presence of a federal claim, 28 U.S.C. § 1331, and the IIED claim is founded on
state law, both the federal and state law claims are so closely factually related
that they form part of the same case or controversy under Article III of the
United States Constitution.  Therefore, this court has supplemental jurisdiction
over the IIED claim under 28 U.S.C. § 1367(a).

¶ 38, 738 N.W.2d 40, 51-52).  As to element number two, liability may also ensue for reckless conduct on the part of the defendant, as opposed to intentional conduct.  Petersen v. Sioux Valley Hosp. Ass'n., (Petersen II), 491 N.W.2d 467, 469 (S.D. 1992); Wangen v. Knudson, 428 N.W.2d 242 (S.D. 1988).

Under South Dakota law, the trial court must decide in the first instance whether the defendant's conduct was extreme and outrageous.  Id. at ¶ 20 (quoting Harris v. Jefferson Partners, L.P., 2002 S.D. 132, ¶ 11, 653 N.W.2d 496, 500 (citing Richardson v. East River Elec. Power Coop., 531 N.W.2d 23, 27 (S.D. 1995))).  "The conduct necessary to form intentional infliction of emotional distress must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.' "  Id. (quoting Harris, 2002 S.D. 132, ¶ 11, 653 N.W. at 500).  "Liability for [IIED] will 'not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.' "  Id. (quoting Harris, 2002 S.D. 132, ¶ 11, 653 N.W. at 500 (quoting Restatement (Second) of Torts § 46 cmt d (1965))).  The conduct must be of a nature that is **_calculated_** to cause, and which actually causes, extremely serious mental distress.  Id. (citing Citibank (S.D.) N.A. v. Hauff, 2003 S.D. 99, ¶ 24, 668 N.W.2d 528, 535).  Only "[w]here reasonable men may differ, [is it] for the jury . . . to determine, whether, in the particular case, the conduct has

been sufficiently extreme and outrageous to result in liability." Richardson, 531 N.W.2d at 27 (quoting Restatement (Second) Torts § 46 cmt. h).

The South Dakota Supreme Court has had numerous opportunities to decide whether summary judgment in a defendant's favor on an IIED claim was warranted.  In Fix, the bank had issued a letter in 1999 telling Fix she could remain in a house for the rest of her lifetime even though the debtors had defaulted on the mortgage loan.  Id. at ¶¶ 2-3, 20, 807 N.W.2d at 614, 618. The bank later went back on its promise and sold the home, forcing Fix to move out.  Id.  The South Dakota Court held that these facts, as a matter of law, did not amount to such extreme or outrageous conduct as to support an IIED claim.  Id. at ¶21, 807 N.W.2d at 618.  Although the court agreed that the bank's decision to renege on its promise may have been intentional, that decision was not "extreme and outrageous" nor did it exceed "all bounds usually tolerated by decent society."  Id. (citing Stene v. State Farm Mut. Auto. Ins. Co., 1998 S.D. 95, ¶32, 583 N.W.2d 399, 404).

Similarly, summary judgment was held appropriate on an employee's IIED claim connected to the termination of her employment in Richardson. Richardson, 531 N.W.2d at 27.  In that case, the plaintiff was summoned to a meeting with her immediate supervisor, the general manager and one other manager.  Id.  She was told the reason she was being fired and allowed an opportunity to rebut those allegations.  Id.  At the conclusion of the meeting,

47

she was escorted to her office to gather her personal belongings and left the building.  Id.  Even though the court recognized that this situation could not have been "particularly pleasant" for the plaintiff, it did not present the building blocks of an IIED claim–no voices were raised, no profanity was used, and the plaintiff was given an opportunity to respond to the allegations.  Id.

In the Harris case, the plaintiff was a 65-year old African-American male who was riding on a common carrier bus when the bus was broad-sided by another vehicle, rendering it immobile.  Harris, 2002 S.D. 132, ¶ 2, 653 N.W.2d at 497-98.  The bus driver told the passengers to walk two blocks back to the bus station and they would be given alternate transportation to their destinations.  Id.  Harris, however, had sustained a groin injury and could not walk two blocks; he asked the bus driver to call an ambulance for him.  Id. The bus driver explained that police had already been called to the scene and Harris should sit down on the curb and wait for them.  Id.  Upon the arrival of paramedics at the scene, Harris' blood pressure was noted to be elevated and he was transported by ambulance to a hospital emergency room.  Id.

After determining that Harris had pleaded a claim of IIED instead of "gross insult," the court affirmed the trial court's grant of summary judgment in the bus company's favor on IIED.  Id. at ¶¶ 10-18, 653 N.W.2d at 500-02. Although the court acknowledged that in determining whether conduct is sufficiently extreme and outrageous, the court must take into account whether

48

the defendant knew of a particular sensitivity or susceptibility on the part of the plaintiff, nevertheless, the bus company's refusal to call an ambulance for Harris in light of his age and his injury was not outrageous conduct.  Id.

In the Hauff case, a creditor had contacted Hauff at her place of employment after Hauff had retained an attorney to represent her in the matter of the debt.  Hauff, 2003 S.D. 99, ¶ 25, 668 N.W.2d 528, 535.  The court held that, although the creditor knew Hauff to be represented at the time it contacted Hauff, this alone was insufficient to support an IIED claim.  Id.  Furthermore, the court rejected Hauff's IIED claim based on the fact that the creditor's agents yelled at Hauff on the phone, made her "feel like a criminal," and that she was upset by these calls.  Id. at ¶ 26, 668 N.W.2d at 536.  Finally, the court rejected Hauff's IIED claim premised on the fact that the creditor had attempted to contact her the day after her son died because the call did not actually reach Hauff and there was no evidence that the creditor knew that Hauff had just suffered a traumatic event.  Id. at ¶ 29, 668 N.W.2d at 536.

In Nelson v. WEB Water Development Ass'n., Inc., 507 N.W.2d 691 (S.D. 1993), Nelson was given a three-year employment contract with WEB.  Id. at 693.  Approximately five months later, new members of the board of directors of WEB were elected, and they offered Nelson a settlement to resign.  Id. Nelson refused the settlement, and the next month Nelson's job performance was discussed at a public meeting of the board of directors and they made a

motion that was passed to fire Nelson that day.  Id.  The South Dakota Supreme Court affirmed the circuit court's grant of summary judgment in WEB's favor on these facts.  Id. at 698-99.

In employment settings where the South Dakota Supreme Court has said that summary judgment was granted in error, the facts are much more extreme than those presented here.  For example, in Kjerstad v. Ravellette, 517 N.W.2d 419 (S.D. 1994),  the employer had used a peep hold to spy on female employees using the restroom.  Id. at 419.

In the case of Petersen, the defendant called Petersen into a meeting with the director of her department, her supervisor, a neutral party, and two co-workers who were allowed to air grievances against Petersen at the meeting. Petersen v. Sioux Valley Hosp. Ass'n., (Petersen I), 486 N.W.2d 516, 517, 519-20 (S.D. 1992).  Petersen was not told what the nature of the meeting would be beforehand (her job performance was the subject of the meeting), and the supervisor who arranged this meeting had specific knowledge that Petersen had a fear of confrontational group meetings.  Id. at 519-20.  Under these facts, the court did **not** hold that summary judgment in **Petersen's** favor was appropriate, only that reasonable minds could differ and, thus, that summary judgment in the defendant's favor was not appropriate.  Id.

In Bass v. Happy Rest, Inc., 507 N.W.2d 317 (S.D. 1993), the South Dakota Supreme Court also reversed a circuit court's grant of summary

50

judgment.  Id. at 323-24.  In that case, there was a litany of extreme and
outrageous conduct by the employer, but the most egregious of those actions
were:  insisting that the plaintiff give the employer a ride to the gas station
when plaintiff was on her way to take her husband to the hospital because he
suffered from a severe heart condition and was experiencing heart pains; telling
the plaintiff that she was not allowed to lock up the employer's business in
order to "take your son of a bitch husband to the doctor because the son of a
bitch is going to die anyway"; refusing to pay for work related injuries; firing
plaintiff and giving her seven hours to move out of the employer's residence
where plaintiff had been living; and refusing to pay plaintiff's wages for a week-
long period.  Id.  Again, as in Petersen, the court did not hold that the plaintiff
was entitled to summary judgment on these facts–only that the defendant was
not.  Id.

     The facts taken from plaintiffs' own statement of undisputed facts,
relevant to the IIED claim, are that both Mike Meinen and Robert Nelson were
employed in part-time positions in the parts department at Godfrey Brake.
Dan Godfrey made a decision to terminate both part-time positions.  On
February 22, 2010, Dan Godfrey terminated Mr. Meinen's employment as well
as Mr. Nelson's.  Both employees had been working for Godfrey Brake for
approximately ten years at the time their employment ended.

Mr. Meinen did not work on February 22, 2010, because he had called in sick. Instead, his wife Jessie Meinen came to Godfrey Brake to pick up her husband's paycheck. Dan Godfrey told Mrs. Meinen that he was terminating her husband's employment.[12] Mrs. Meinen asked Dan to let her husband do some other work for Godfrey Brake other than the job he had been doing at the parts counter. Dan Godfrey responded that there was nothing else for Mr. Meinen to do. Dan asked Mrs. Meinen to notify her husband when she went home. For the sake of the pending cross-motions for summary judgment, the court assumes that both Mr. and Mrs. Meinen suffered the kind of severe emotional distress required by the elements of the tort of IIED. There is no allegation that Dan Godfrey was abrupt, rude, or that he used any profanities. There is no allegation that Dan Godfrey raised his voice in any way or physically encroached on Mrs. Meinen's personal space. There is no allegation that Dan Godfrey told Mrs. Meinen of this news in front of an audience.

These facts simply do not present the kind of extreme and outrageous conduct required to satisfy the first element of an IIED claim. The words and demeanor of Dan Godfrey were unobjectionable. There is nothing in the record

---

[12]This conversation is alleged by Godfrey Brake to have occurred in the privacy of Dan Godfrey's office. This fact is not disputed by plaintiffs. Defendant also alleges that Dan told Mrs. Meinen that the decision to terminate Mr. Meinen's position was difficult, but that he was doing so for business reasons.

before the court to suggest that Dan Godfrey knew that either plaintiff had any special sensitivity or susceptibility to being told of the job termination. Mr. Godfrey appears to have taken steps to ensure that the blow of a job loss landed as softly as possible–by telling Mrs. Meinen in private and in cordial words.

The one unusual thing about Dan Godfrey's termination of Mike Meinen's employment was that the termination was communicated to Mrs. Meinen rather than to Mike directly.  However, this in and of itself, is not sufficient to make the conduct extreme and outrageous.  The tort requires intentional or reckless conduct.  Mr. Godfrey testified that the reason he chose to tell Mrs. Meinen instead of Mr. Meinen was because Mr. Meinen did not come to work that day and Dan Godfrey had already told Robert Nelson about his decision to eliminate both part-time positions.  Mr. Godfrey simply wanted Mike Meinen to learn of his termination from Godfrey, rather than circuitously through Nelson or someone else.

The Richardson case and the Petersen case involve similar facts in an employment termination setting, but one resulted in affirmance of a circuit court's granting of summary judgment and the other resulted in a reversal of such a grant.  This court discerns the main difference between the two to boil down to the fact that Petersen's boss knew she had a special sensitivity to confrontational meetings, that the boss nevertheless staged such a meeting,

53

and ambushed Petersen with the meeting.  Here, there is no allegation that
Dan Godfrey had any knowledge that Mr. or Mrs. Meinen would have such a
severe reaction to Mr. Meinen losing his job, or that Mrs. Meinen would suffer
severe emotional distress at having to be the message bearer.  Certainly losing
a job is an unpleasant experience for anyone, but as the South Dakota
Supreme Court has observed, one must expect some unpleasantries in life and
not all are actionable.  Hauff, 2003 S.D. at ¶¶ 26-27, 668 N.W.2d at 536
(noting that yelling, making one feel like a criminal and threatening
garnishment are "definitely inconsiderate and unkind" but that they are not
atrocious or utterly intolerable and that a "reasonable person is expected to be
able to withstand some extent of" unpleasant behavior).

This court recommends denying plaintiffs' motion for summary judgment
on their IIED claim and granting defendant's motion for summary judgment on
that claim.  No genuine issue of material fact exists as to the first element of
the plaintiffs' IIED claim and the actions attributed to defendant do not rise to
the level of extreme and outrageous conduct as required by the tort.

**D.     Conversion**

Both plaintiffs and defendant also move for summary judgment in each
of their respective favors on plaintiffs' conversion claim.  Plaintiffs' conversion
claim is premised on the allegation that, when taking home Mr. Meinen's
computer from defendant's premises, defendant's employee placed the

54

computer in some snow or a wet area and this exposure to moisture ruined Mr. Meinen's computer.

The facts alleged by plaintiffs in support of their conversion claim are that Deborah Meinen retrieved Mr. Meinen's computer from defendant subsequent to Mr. Meinen's termination.  When Deborah arrived, defendant's employee Kevin Vaughn assisted her.  Mr. Vaughn unplugged the computer without first powering it down.  Outside defendant's building, Mr. Vaugh sat the computer down against a snow bank, causing the bottom of the computer to get wet.  The computer had to be dried off when it was returned to Mr. Meinen.  The computer never worked again after Mr. Meinen received it back from defendant.

"Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right."  First American Bank & Trust, N.A. v. Farmers States Bank, 2008 S.D. 83, ¶ 38, 756 N.W.2d 19, 31 (quoting Chem-Age Indus., Inc. v. Glover, 2002 S.D. 122, ¶ 20, 652 N.W.2d 756, 766).  The *prima facie* elements of a claim of conversion are:

1.  Mr. Meinen had a possessory interest in the property;

2.  Mr. Meinen's interest in the property was greater than defendant's interest in the property;

3.  defendant exercised dominion or control over or seriously interfered with Mr. Meinen's interest in the property; and

> 4.     defendant's conduct deprived Mr. Meinen of his interest in
>        the property.

First American Bank & Trust, N.A., 2008 S.D. 83, ¶ 38, 756 N.W.2d at 31.

"The act constituting 'conversion' must be an intentional act, but it does not require wrongful intent . . ." Denke v. Mamola, 437 N.W.2d 205, ___ (S.D. 1989) (quoting Rensch v. Riddle's Diamonds of Rapid City, 393 N.W.2d 269, 271 (S.D. 1986)).  "Intent or purpose to do a wrong is not a necessary element of proof to establish conversion." Chem-Age Indust., Inc., 2002 S.D. 122, ¶ 20, 652 N.W.2d at 766 (quoting Rensch, 393 N.W.2d at 271).  As the South Dakota Supreme Court has explained:

> The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant.  It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results.  Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are the gist of the action.

Rensch, 393 N.W.2d at 271 (quoting Poqqi v. Scott, 167 Cal. 372, 139 P. 815, 816 (1914)).

Neither party disputes that the computer no longer works.  Neither party offers an explanation as to why or how the computer came to be inoperable.  Thus, a key issue with regard to the conversion claim is which party has the burden of proof to show causation.  Do plaintiffs have to show that the moisture caused the computer to quit working?  Or is it defendant's burden to show that their actions were not the cause of the computer's failure?  Although

56

defendant need not have known or intended to damage the computer, the conversion claim is based on defendant's alleged damaging of the computer, so it must still be established that some act of defendant (or its agent) caused the damage.

This is contemplated in the third element of the tort, whereby it must be shown that defendant exercised dominion or control over or seriously interfered with Mr. Meinen's interest in the property.  That dominion or control is alleged to have been the damage to the computer.  But the assertion begs the question as to how exactly the computer was damaged.  If it was damaged during the jostling and moving which occurred in the back of Deborah's vehicle and subsequent carrying in of the computer to Mr. Meinen's home, then defendant did not damage the computer and, thus, did not "exercise dominion or control over" the computer so as to interfere with Mr. Meinene's interest in the computer.

Plaintiffs' claim of conversion is similar to the evidentiary doctrine of ***res ipsa loquitur***.  In order for ***res ipsa*** to apply in a given circumstance, the plaintiff must show that "the instrumentality which caused an injury must have been under the full management and control of the defendant or his servants; that the accident was such that according to common knowledge and experience does not happen if those having management or control had not been negligent; and that plaintiff's injury must have resulted from the

accident." <u>Kramer v. Sioux Transit, Inc.</u>, 85 S.D. 232, 239, 180 N.W.2d 468, 472 (1970) (citing <u>Henrichs v. Inter City Bus Lines</u>, 79 S.D. 267, 111 N.W.2d 327 (1961); <u>Larson v. Loucks</u>, 69 S.D. 60, 6 N.W.2d 436 (1943); and <u>Barger v. Chelpon</u>, 60 S.D. 66, 243 N.W. 97(1932)). ***Res ipsa*** can only apply "where the circumstances leave no room for different presumptions or inferences" as to how the injury occurred or who caused the injury. <u>Kramer</u>, 85 S.D. at 239, 180 N.W.2d at 472. "The mere possibility that an act of the defendant could have caused" the injury "does not warrant the application of the doctrine of ***res ipsa loquitur***." <u>Id.</u> at 239-40, 180 N.W.2d at 472. The "doctrine of ***res ipsa loquitur*** is to be utilized sparingly and only when the facts and demands of justice make its application essential." <u>Casillas v. Schubauer</u>, 2006 S.D. 42, ¶ 24, 714 N.W.2d 84, 90 (quoting <u>Wuest v. McKennan Hosp.</u>, 2000 S.D. 151, ¶ 18, 619 N.W.2d 682, 688).

The case of <u>Shipley v. City of Spearfish</u>, 89 S.D. 559, 235 N.W.2d 911 (1975), involved property damage that the plaintiffs alleged had been cased by defendant's sewer. <u>Id.</u> at 560-61, 235 N.W.2d at 912. The circuit court had given the jury an instruction on the doctrine of ***res ipsa loquitur***. <u>Id.</u> at 561-62, 235 N.W.2d at 913. The South Dakota Supreme Court held that the jury should never have been instructed on ***res ipsa*** because the evidence did not warrant the application of the doctrine. <u>Id.</u> The court noted that the trial record was abundantly clear that the defendant had not had exclusive control

of the sewer system, noting that it was easily accessible and that any homeowner connected to defendant's sewer system could access it, as well as any passerby who removed a manhole cover.  Id.  Since plaintiffs could not prove that the sewer system had been under defendant's exclusive control, the **res ipsa** doctrine did not apply.  Id.  The court reached the same conclusion in Blue Fox Bar, Inc. v. City of Yankton, 424 N.W.2d 915, 920-21 (S.D. 1988), where the city's circuit breaker in its electrical system which operated a lift station in the sewer system was tripped and caused sewage to back up into a Super 8 Motel.

Here, Mr. Meinen has simply not provided proof that the reason his computer does not work today is because Mr. Vaughn sat the computer down proximate to a snow bank.  No evidence or opinion is offered regarding the effect of water on the exterior of a computer.  Furthermore, the computer was not in the exclusive possession or control of defendant.  It was passed into the hands of Deborah Meinen, who transported the computer to Mr. Meinen. Someone must have carried the computer into Mr. Meinen's home from Deborah's vehicle and deposited it in the home.  Additionally, plaintiffs did not notify defendant of the fact that the computer did not work for approximately one month after Deborah retrieved the computer from defendant.  The computer was out of defendant's possession and control for that entire time. **Res ipsa loquitur** simply cannot apply under these facts.  Plaintiffs have not

alleged any other facts from which the court could conclude that the reason
Mr. Meinen's computer does not work today is because of Mr. Vaughn's actions
on the day Deborah retrieved the computer.  It is equally plausible to assume
that some delicate electronic part inside the computer was jostled by Deborah
Meinen herself upon transporting the property.  Summary judgment must
issue in favor of defendant on this claim because plaintiff has not provided
evidence to create a genuine issue of material fact as to causation.

## CONCLUSION

Based on the foregoing discussion, this court respectfully recommends
denying in full the motion for partial summary judgment [Docket No. 28] made
by plaintiffs and granting in full the motion for summary judgment [Docket No.
36] made by defendant.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and
recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B),
unless an extension of time for good cause is obtained.  See also Fed. R. Civ. P.
72(b)(2).  Failure to file timely objections will result in the waiver of the right to
appeal questions of fact.  Objections must be timely and specific in order to
require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d

356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

Dated March 26, 2012.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE